## A01A1808. ROCKEFELLER v. KAISER FOUNDATION HEALTH PLAN OF GEORGIA et al.
### (554 SE2d 623)

PHIPPS, Judge.

Kimberly Rockefeller brought this medical malpractice action against a health maintenance organization (HMO) of which she was a member and against various of its corporate affiliates and individual employees. She complains that a physician's assistant (PA), supervised by physicians who had not been approved by the Composite State Board of Medical Examiners (the Board), treated her and performed tasks not authorized by his job description on file with the Board. For these reasons, she claims that the defendants committed negligence per se by violating the Physician's Assistant Act (PAA or the Act)[1] and regulations implemented by the Board under the Act.[2] She moved for partial summary judgment on her claim of negligence per se. The trial court denied the motion. We granted Rockefeller's application for interlocutory appeal.

Rockefeller was a member of an HMO incorporated as Kaiser Foundation Health Plan of Georgia and doing business as Kaiser Permanente. Dr. Bruce Sabin was her primary care physician. He was employed by a Kaiser subsidiary at the Gwinnett Medical Center on Pleasant Hill Road in Duluth. Drs. Sean Murphy and Martin Ettinger and PA Jimmy McPeters were also employed there. Sabin filed an application with the Board for utilization of McPeters as a PA. Although certain other physicians were listed as additional supervising physicians, Murphy and Ettinger were not.

McPeters's "basic job description" on file with the Board authorized him to "order/select a dangerous drug or controlled substance or order medical treatments or diagnostic studies in any health care setting in accordance with [Board] Rule 360-5-.07 (8)" and to "perform those routine medical treatments and diagnostic procedures for

[1] OCGA § 43-34-100 et seq.
[2] Rules & Regulations of the State of Georgia, Rules of Composite State Board of Medical Examiners, Rule 360-5-.01 et seq.

which he/she is qualified by training and which fall within the normal scope of practice of the supervising physician as delegated by the supervising physician." McPeters also was authorized by his job description to "gather data base on all new patients or established patients with new problems to include a complete medical history and physical examination, medical record review, appropriate initial diagnostic studies, and will be responsible for transmitting that information to the supervising physician(s) for review." If a "life threatening emergency situation" arose when the supervising physician was not present, McPeters was authorized to "initiate appropriate evaluation and treatment."

Although the Board had not authorized Murphy or Ettinger to supervise McPeters, Sabin testified that he approved these doctors' supervision of McPeters so that he could render services to Sabin's patients. Specifically, Sabin testified that McPeters was authorized to order medications for patients which were authorized and prescribed by a physician and to arrive at a provisional diagnosis when a physician countersigned the medical record concluding that the documented clinical conditions justified the action taken.

On April 21, 1997, Rockefeller appeared at Gwinnett Medical Center complaining of nasal congestion, dry cough, and fever to the extent that she was unable to sleep. Sabin was not there. After McPeters examined Rockefeller, he arrived at a provisional diagnosis of viral syndrome and selected a Ventolin inhaler, cough syrup, Motrin, and guaifenesin for her treatment. Ettinger reviewed and countersigned Rockefeller's medical records, noting his determination that documented clinical conditions justified the action taken. Murphy reviewed and cosigned the prescriptions.

The next day, Rockefeller experienced severe shortness of breath. She was taken by ambulance to the hospital where a chest x-ray revealed pneumonia. After being admitted to the hospital, Rockefeller became comatose and remained so for two months. She now suffers from severe permanent disabilities. She claims defendants were negligent in misdiagnosing her condition and in failing to order an appropriate diagnostic study, i.e., an x-ray of her chest.

In moving for partial summary judgment on her claim of negligence per se, Rockefeller argued that defendants violated the PAA, specifically OCGA §§ 43-34-103 (e.1) (1) and 43-34-105, because the Board had not authorized McPeters to treat patients or carry out prescription drug orders under the supervision of Murphy or Ettinger. As authority in support of her claim that violations of the PAA constitute negligence per se, Rockefeller relied on the decision of the

Supreme Court of Georgia in *Central Anesthesia Assoc. v. Worthy*.[3] Additionally, she asserted that McPeters's job description did not authorize him to render a provisional diagnosis of her condition.

In opposition to Rockefeller's motion, defendants argued that under *Cardio TVP Surgical Assoc. v. Gillis*,[4] the Board is vested with exclusive authority to determine whether the PAA has been violated. Additionally, defendants argued that the PAA does not establish standards of conduct so that violations of the Act cannot give rise to actions based on negligence per se; that OCGA § 43-34-103 (b) implicitly authorizes physicians in a group practice setting to supervise PAs licensed to other physicians in the group without Board approval; and that there are, in any event, issues of fact as to whether the PAA was violated.

We resolve these issues as follows. In Division 1, we affirm the trial court's grant of Rockefeller's motion for partial summary judgment on questions of whether defendants committed negligence per se as a result of McPeters's treatment of Rockefeller and his ordering of prescription drugs without being supervised by a Board-approved physician. In so holding, we find *Worthy* applicable and *Cardio TVP* distinguishable. In Division 2, we reverse the trial court's grant of partial summary judgment to Rockefeller on the question of whether defendants committed negligence per se on the ground that McPeters performed a task not authorized by his job description by rendering a provisional diagnosis of Rockefeller's condition. We find that there are material issues of fact on this question. In Division 3, we reject the defendants' argument concerning OCGA § 43-34-103 (b).

1. The General Assembly enacted the PAA "to encourage the more effective utilization of the skills of physicians by enabling them to delegate health care tasks to [PAs] where such delegation is consistent with the patient's health and welfare."[5] In order to obtain approval for the utilization of a person as a PA, the Act requires the licensed physician who will be responsible for the performance of that assistant to submit an application to the Board.[6] Board regulations make clear that more than one physician may be listed on the application,[7] although the number of PAs which may be licensed to any one physician is limited by OCGA § 43-34-103 (b). Both the Act and the regulations require that each physician provide individualized information to the Board relating to his or her professional background and practice specialty before being approved as a PA's super-

---

[3] 254 Ga. 728, 730-733 (1), (2) (333 SE2d 829) (1985).
[4] 272 Ga. 404, 405 (1) (528 SE2d 785) (2000).
[5] OCGA § 43-34-101 (b).
[6] OCGA § 43-34-103 (a).
[7] Rule 360-5-.03 (c).

vising physician.[8] In approving the application, the Board thus determines whether the physician is qualified to competently supervise that particular PA.

The application must also include a job description for the PA.[9] The Act, in OCGA § 43-34-105, states that the PA may perform the tasks described in the job description "under the direction of the applying physician." Under Board Rules 360-5-.04 (2) and 360-5-.07 (2), a PA may perform only those tasks which are specified, for the physician or physicians named, in his job description then on file with "and approved by the Board."

Under OCGA § 43-34-103 (e.1) (1), "a [PA] shall be allowed to carry out a prescription drug order . . . pursuant to the authority delegated by the supervising physician of that [PA]." This Code section further provides that "[d]elegation of such authority shall be contained in the [PA's] job description" and that the delegating physician "shall adequately supervise the [PA]." Under the Act, to "[c]arry out a prescription drug . . . order" means "to complete, on a form established and approved by the board, a written prescription drug order . . . pursuant to the authority delegated by a supervising physician."[10] Board Rule 360-5-.07 (8) (a) (3) states that "ordering/selecting of a drug under such delegation shall not be construed to authorize prescribing, which act can only be performed by the supervising physician." This rule, however, further authorizes the PA to prepare a written prescription, "the issuance of which has been authorized by the supervising physician, so long as such written prescription is signed by the supervising physician on the date when issued, and so long as the prescription is not signed in blank."

As recognized by this court in *Central Anesthesia Assoc. v. Worthy*,[11]

> [i]t is well-settled that Georgia law allows the adoption of a statute as a standard of conduct so that its violation becomes negligence per se. [Cit.] The standard of review to determine whether the violation of a statute is negligence per se is two-fold. . . . "[I]t is necessary to examine the purposes of the legislation and decide (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm it was intended to guard against. (Cits.)". . . For a violation of the statute to be negligence per se, the violation

---

[8] OCGA § 43-34-103 (a) (3); Rule 360-5-.03 (c) (3).
[9] OCGA § 43-34-103 (a) (3).
[10] OCGA § 43-34-102 (2).
[11] 173 Ga. App. 150 (325 SE2d 819) (1984), aff'd, supra, 254 Ga. 728.

"must be capable of having a causal connection between it and the damage or injury inflicted upon the other person." [Cit.] . . . This refers not to the proximate cause element of the negligence action, which [Rockefeller] must still prove by a preponderance of the evidence, but rather to the character of the legal duty involved. Is this statutory duty one which, if breached, is capable of producing injury to [a person being treated by a PA]?[12]

Violation of a regulation may also constitute negligence per se.[13] Rockefeller's primary claim is that the defendants were negligent per se because they violated OCGA § 43-34-105. In full, it provides:

On receipt of notice of the board's approval, a [PA], under the direction of the applying physician, may perform the tasks described in the job description, provided that nothing in this Code section shall make unlawful the performance of a medical task by the [PA], whether or not such task is specified in the general job description, when it is performed under the direct supervision and in the presence of the physician utilizing him.

The statute is thus composed of two parts. The first part creates a general rule, and it establishes a standard of conduct under which a PA may perform only those tasks in his job description and only under the direction of the applying physician. These limitations are intended to protect the health and welfare of patients such as Rockefeller, by insuring that the PA's treatment of the patient is overseen by a physician who is qualified to supervise the PA in the tasks performed. These limitations are certainly intended to guard against harm suffered by patients as a result of mistakes such as those charged to McPeters. Consequently, under the analysis set forth in *Worthy*, the defendants' violation of this statutory standard constitutes negligence per se.[14]

The defendants, however, relying on the second part of OCGA

---

[12] Id. at 152-153.

[13] *Donaldson v. Dept. of Transp.*, 236 Ga. App. 411, 416 (1) (b) (511 SE2d 210) (1999).

[14] See also *Central Anesthesia Assoc. v. Worthy*, supra, 254 Ga. 728 (finding negligence per se based on violation of statute requiring licensed physician with training or experience in anesthesiology to supervise certified registered nurse anesthetist in administering anesthesia). Thus, statutes containing licensing requirements may also establish standards of conduct. See *Ledee v. Devoe*, 250 Ga. App. 15, 21 (8) (549 SE2d 167) (2001) (practice of law without a license constitutes negligence per se); *Horney v. Panter*, 204 Ga. App. 474, 475-476 (2) (420 SE2d 8) (1992) (recognizing that engaging in electrical contracting business without a license may constitute negligence per se).

§ 43-34-105 and *Cardio TVP Surgical Assoc. v. Gillis,*[15] argue that Rockefeller is not entitled to summary judgment on any negligence per se issues because determinations as to whether the PAA has been violated must be made by the Board. The second part of the statute erects a proviso to the general rule established in the first part. In *Cardio TVP*, the Supreme Court interpreted the proviso as authorizing a PA to perform any work that the assistant is competent to do, even if the task is not set forth in his job description, if the task is performed under the direct supervision and in the presence of the physician utilizing the PA.

The question in *Cardio TVP* was whether a PA was competent to harvest the saphenous vein of a patient in the presence and under the supervision of a physician performing a coronary bypass operation. On direct appeal from an order of the trial court granting the defendants' motion for partial summary judgment on the issue, this court held that the question presented was for a jury to determine.[16] The Supreme Court granted certiorari and reversed, holding that it is a matter strictly for the Board to determine the nature and scope of the medical tasks which any PA may be qualified to perform. Because the defendants in *Cardio TVP* presented testimony from the executive director of the Board that the procedure at issue was considered a routine medical task capable of being performed by PAs, and because the plaintiff adduced no evidence in rebuttal, the Supreme Court held that the defendants were entitled to summary judgment on the issue.

Contrary to the argument advanced by the defendants, we do not interpret *Cardio TVP* as depriving the courts of the authority to determine whether the PAA has been violated where, as here, the PAA itself establishes certain standards of conduct which do not involve any determination by the Board concerning the competency of a PA to perform a given task or concerning some other medical issue.[17] Because it is undisputed that no Board-approved physician supervised McPeters's treatment of Rockefeller and his ordering of the prescription drugs in this case, Rockefeller has shown that the

---

[15] Supra, 272 Ga. 404.

[16] *Gillis v. Cardio TVP Surgical Assoc.*, 239 Ga. App. 350, 353 (1) (a) (520 SE2d 767) (1999).

[17] The requirements of the PAA do not, however, "create a duty, the breach of which is inextricable from the proximate cause of the [plaintiff's] damage. . . ." *Central Anesthesia Assoc. v. Worthy*, supra, 254 Ga. at 733 (2). In order to recover under a negligence per se theory, Rockefeller therefore must establish a proximate causal relationship between defendants' violation of the PAA and the injuries for which she seeks recovery. In essence, she must show that if McPeters had been supervised by a Board-approved physician, he would have accurately diagnosed her condition and ordered the correct medications. Basically, this will require her to prove that McPeters was negligently supervised. In practice, therefore, Rockefeller's negligence per se theory does not materially advance her cause.

defendants violated OCGA §§ 43-34-103 (e.1) (1) and 43-34-105 without testimony from a Board representative.

2. We do agree, however, that whether McPeters exceeded the scope of his job description by rendering a provisional diagnosis of Rockefeller's condition is a question which cannot be answered without testimony from a Board representative. Although McPeters's job description expressly authorized him to "initiate appropriate evaluation" in the event of a "life threatening emergency situation," it also allowed him to "order routine . . . diagnostic procedures for which [he] is qualified by training . . ." and to "order/select" prescription drugs. It could be argued that if the PA is qualified by training to do so, the foregoing job description implicitly authorizes him to provisionally diagnose a condition for which prescription drugs are "order[ed]/select[ed]."

3. Finally, we reject defendants' argument that under OCGA § 43-34-103 (b), a physician who is a member of a group practice setting may supervise the PA of another physician within the group without Board approval. In full, prior to its 2001 amendment, OCGA § 43-34-103 (b) provided:

> No physician shall have more than two physician's assistants licensed to him or her at any one time. However, a physician may supervise more than two [PAs] while on call for a solo practitioner or as a member of a group practice setting. . . . The physician taking call must be approved to supervise the [PA] of the physician for whom he or she is taking call.

As we interpret OCGA § 43-34-103 (b), a physician taking call for a solo practitioner *or* as a member of a group practice may supervise more than two PAs but must still be approved by the Board to supervise each of them. To interpret "on call" as modifying the phrase "for a sole practitioner" but not the words "as a member of a group practice setting" would result in a partial repeal by implication of the general requirement that any physician seeking supervisory authority over a PA must obtain Board approval. "Repeals by implication are not favored."[18]

Consequently, as to Rockefeller's claim of negligence per se, she was entitled to partial summary judgment on the subissues relating to defendants' violations of OCGA §§ 43-34-105 and 43-34-103 (e.1) (1). On the question of whether McPeters exceeded his job description by rendering a provisional diagnosis, Rockefeller was not entitled to summary judgment.

---

[18] *Chatham County v. Hussey*, 267 Ga. 895 (485 SE2d 753) (1997).

*Judgment affirmed in part and reversed in part. Smith, P. J., and Barnes, J., concur.*

DECIDED OCTOBER 3, 2001.

*Neal H. Howard & Associates, Neal H. Howard, William D. James, Debra S. Robinson, Baum & McGahren, Matthew F. McGahren,* for appellant.

*Love & Willingham, Jonathan C. Peters, Jason B. Branch,* for appellees.